**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**SHAWN D. BURTON,**

      **Plaintiff,**

**vs.**                            **Case No.  5:13cv219-CAS**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

      **Defendant.**

_____/

## MEMORANDUM OPINION AND ORDER

This is a Social Security case referred to the undersigned United States Magistrate Judge upon consent of the parties and reference by Senior United States District Judge William Stafford.  Doc. 10.  *See* Fed. R. Civ. P. 73; 28 U.S.C. § 636(c).  After careful consideration of the record, the Court affirms the decision of the Commissioner.

## I.  Procedural History

On October 28, 2011, Plaintiff, Shawn D. Burton, filed a Title II application for a period of disability and Disability Insurance Benefits (DIB) and a Title XVI application for Supplemental Security Income (SSI) alleging disability beginning October 25, 2010, due to alcoholism, mental problems, and depression.  R. 14, 225-34, 264, 268.  (Citations to the record shall be by the symbol "R." followed by a page number that appears in the

lower right corner.)  Plaintiff's date last insured, or the date by which his disability must have commenced in order to receive DIB under Title II is December 31, 2015.  R. 14.

Plaintiff's applications were denied initially on December 29, 2011, and upon reconsideration on February 8, 2012.  R. 14, 112-24, 130-40.  On February 17, 2012, Plaintiff requested a hearing.  *Id.*  On November 5, 2012, Administrative Law Judge (ALJ) Stacy Paddack held a video hearing with the Plaintiff appearing with David E. Evans, an attorney in Panama City, Florida, and the ALJ presiding from Tallahassee, Florida.  R. 14, 28, 30, 125-26.  Plaintiff appeared and testified at the hearing.  R. 14, 38-59.  Gail E. Jarrell, an impartial vocational expert, testified during the hearing.  R. 14, 59-64, 214-16 (Resume).

Plaintiff argues that the ALJ erred in not finding Plaintiff disabled under Listing 12.05C under 20 C.F.R. Part 404, Subpart P, Appendix 1.  During the hearing, the ALJ and counsel discuss Listing 12.05 in light of the record at the time of the hearing.  The relevant portion of the discussion appears under section IV.B., *infra*.

The record before the ALJ was supplemented with Exhibit 11E (Plaintiff's school records) after the close of the hearing.  Doc. 17 at 8; R. 306-23; R. 26 (Education Records – Medical).  The ALJ referred to Exhibit 11E in her decision.  R. 19.

On December 20, 2012, the ALJ issued a decision and denied Plaintiff's applications for benefits concluding that Plaintiff was not disabled from February 9, 2008, through the date of the ALJ's decision.  R. 14-23.  On January 16, 2013, Plaintiff requested review of this decision, which the Appeals Council denied on April 24, 2012.  R. 1-4, 8-9.  The ALJ's decision stands as the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981.

On June 7, 2013, Plaintiff filed a Complaint with the United States District Court seeking review of the ALJ's decision.  Doc. 1.  The parties filed memoranda of law, docs. 17 and 20, which have been considered.

## II. Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1. "The claimant meets the insured status requirements of the Social Security Act through December 31, 2015."  R. 16.

2. "The claimant has not engaged in substantial gainful activity since October 25, 2010, the alleged onset date."  *Id.*  The ALJ noted that Plaintiff worked after the alleged onset date, but this work did not rise to the level of substantial gainful activity.  *Id.*

3. "The claimant has the following severe impairments: general anxiety disorder, depression, alcohol abuse and a history of speech problems."  R. 17.

4. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  *Id.*  The ALJ considered whether the severity of Plaintiff's mental impairments, considered singly or in combination, met or medically equaled the criteria of Listings 12.04, 12.06, or 12.09.  The ALJ concluded they did not, finding that Plaintiff had *mild* restrictions in activities of daily living, *moderate* difficulties in social functioning and with regard to concentration, persistence, or pace, and *no* episodes of decompensation of extended duration.  R. 17-18.  As a result, the ALJ determined that the "paragraph B" criteria of these listings were not satisfied. *Id.*  The ALJ also determined that the criteria in "paragraph C" of Listings 12.04 and 12.06 were not satisfied, noting that there are no "paragraph C" criteria regarding Listing 12.09.  R. 18.  The ALJ made no findings regarding Listing 12.05 and this matter is the subject of judicial review.  R. 17-18.

5. "[T]he claimant has the residual functional capacity [RFC] to perform a full range of work at all exertional levels but with the following non-exertional limitations: may perform simple, routine and repetitive tasks; must work in a low-stress environment with only occasional changes in the work setting; may not perform any production rate or pace work; and he may not engage in any complex verbal or written communications."  *See* R. 18."[1]

---

[1] A residual functional capacity (RFC) is the most a claimant can still do despite limitations.  20 C.F.R. § 404.1545(a)(1).  *See infra* n.4.  It is an assessment based upon all of the relevant evidence including the claimant's description of his limitations, observations by treating and examining physicians or other persons, and medical

6. "The claimant is capable of performing past relevant work as a Bagger.  This work does not require the performance of work-related activities precluded by the claimant's [RFC]."  R. 21.  The vocational expert testified that Plaintiff had past relevant work as a Bagger retail, a medium, unskilled job with a SVP of 2, and further testified that a person with the same age, education, vocational background and RFC as Plaintiff would be able to perform the past work as a Bagger.  R. 21, 62-63.

7. In the alternative, the ALJ also determined at step five, with the assistance of the vocational expert, that Plaintiff would be able, notwithstanding being compromised by non-exertional limitations, to perform several jobs in the national economy such as industrial cleaner, a medium, unskilled job, with a SVP of 2; food preparation worker, a medium, unskilled job with a SVP of 2; and automobile detailer, a medium, unskilled job with a SVP of 2.  R. 22, 63-64.[2]

8. "The claimant has not been under a disability, as defined in the Social Security Act, from October 25, 2010, through the date" the ALJ's decision.  R. 22.

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial

evidence is more than a scintilla, but less than a preponderance.  It is such relevant

evidence as a reasonable person would accept as adequate to support a conclusion."

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord

Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual

---

records.  *Id.*  The responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 404.1546(c).

  [2] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 404.1568(a).  An SVP of 1 means a "[s]hort demonstration only."  Dictionary of Occupational Titles (DOT) (4th Ed., Rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.  An SVP of 2 means "[a]nything beyond short demonstration up to and including 1 month."  *Id.*

findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).  The court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision.  Moore, 405 F.3d at 1211.[3]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

---

[3]  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).[4]

Both the "impairment" and the "inability" must be expected to last not less than 12

months.  Barnhart v. Walton, 535 U.S. 212 (2002).  In addition, an individual is entitled

to DIB if she is under a disability prior to the expiration of her insured status.  *See*

42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of

Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y

of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-

(v).

> 1.      Is the individual currently engaged in substantial gainful activity?
>
> 2.      Does the individual have any severe impairments?
>
> 3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?
>
> 4.      Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?
>
> 5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  Consideration

---

[4]  The relevant DIB and SSI regulations are virtually identical.  As a result, citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599, unless a SSI regulation provides otherwise.  The parallel regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations, e.g., 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

is given to the assessment of the claimant's RFC and the claimant's past relevant work.

If the claimant can still do past relevant work, there will be a finding that the claimant is

not disabled.  If the claimant carries this burden, however, the burden shifts to the

Commissioner at step five to establish that despite the claimant's impairments, the

claimant is able to perform other work in the national economy in light of the claimant's

RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel,

190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen,

786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g).  If the

Commissioner carries this burden, the claimant must prove that he or she cannot

perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007,

1011 (11th Cir. 1987).

## IV.  Legal Analysis

### A.  Issues

Plaintiff raises three issues for consideration: (1) whether the ALJ erred when

she did not find Plaintiff's 1989 Weschler Intelligence Scale for Children's IQ score of

69, in conjunction with Plaintiff's diagnosis, symptoms, and impairments, satisfied the

criteria under Listing 12.05C; (2) whether the ALJ erred in failing to develop the record

regarding a possible claim under Listing 12.05; and (3) whether the ALJ erred in failing

to reference or discuss Plaintiff's assigned Global Assessment of Functioning (GAF)

scores (two) of less than 45.  Doc. 17 at 1-2, 5-10.

### B.  The ALJ did not err in not finding that Plaintiff met the criteria under Listing 12.05 and in not developing the record further.

At step three, the claimant has the burden of proving that his impairments meet

or equal a listed impairment by presentation of specific evidence of medical signs,

symptoms, or laboratory test results meeting all of the specified medical criteria.

Sullivan v. Zebley, 493 U.S. 521, 530 (1990).  "For a claimant to show that his

impairment matches a listing, it must meet *all* of the specified medical criteria.  An

impairment that manifest only some of those criteria, no matter how severely, does not

qualify."  *Id.*

Listing 12.05C provides in relevant part:

12.05 Mental retardation:  Mental retardation refers to significantly subaverage general intelligence functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before the age of 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

* * * *

C.  *A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.*

20 C.F.R., Pt. 404, Subpt. P, App. 1, Listing 12.05C (emphasis added).  Section

12.00D.6.c. provides in part: "In cases where more than one IQ is customarily derived

from the test administered, e.g., where verbal, performance, and full scale IQs are

provided in the Wechsler series, we use the lower of these in conjunction with 12.05."

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00D.6.c.  Section 112.00D.10 provides:

10.  IQ test results must also be sufficiently current for accurate assessment under 112.05.  Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior.  IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above.  *IQ test results obtained before age 7 are current for 2 years if the tested IQ is less than 40 and 1 year at 40 or above.*

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 112.00D.10. (emphasis added).  "If a claimant

has been able to adapt in functioning after age 22, it is permissible to find that Listing

12.05C has not been met."  Monroe v. Astrue, 726 F. Supp. 2d 1349, 1355 (N.D. Fla.

2010).

At step three, the ALJ determined that Plaintiff did not have an impairment or

combination of impairments that meets or medically equals one of the listed

impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1.  R. 17.  In making this

determination, the ALJ considered the criteria of Listings 12.04 (affective disorders),

12.06 (anxiety related disorders), and 12.09 (substance addiction disorders).  R. 17.

The ALJ did not expressly consider the criteria of Listing 12.05 (mental retardation),

although she considered Plaintiff's school records and, in particular, that Plaintiff

underwent psychological testing in May 1989 for educational placement.  R. 19.  Plaintiff

was five years old at the time of that testing.  R. 306 (Exhibit 11E filed post-hearing).

Plaintiff had been "referred for a psychoeducational evaluation to determine the

appropriate educational placement for the 1989-90 school year.  He had attended the

potentially handicapped program for preschoolers since 6-15-87."  R. 306.  Plaintiff

achieved a verbal IQ score of 69 (the lowest of three IQ scores) on the Wechsler

Intelligence Scale for Children.  R. 310.

As part of her RFC assessment, the ALJ made the following findings:

> Turning to the medical evidence, the objective findings in this case fail to provide
> strong support for the claimant's allegations of disabling symptoms and
> limitations.  In May 1989, the claimant underwent psychological testing for
> educational placement (Ex. 11E).  Results from an earlier speech and language
> evaluation suggested that the claimant, who was essentially non-verbal at that
> time, had delays in the areas of receptive and expressive communication.
> However, by 1989, he had made noteworthy improvements (Ex. 11E).
> "According to school personnel, Shawn now uses complete sentences and uses

names to get others' attention.…  Shawn was able to state his first name, last name, age, and city; name ten basic colors; name basic picture vocabulary items; and rote count to 10" (Ex. 11E).  Still, psychologist Dawn Forbes determined that the claimant had severe delays in the verbal area, such that he met the requirements for placement in the Severe Speech and Language program (Ex. 11E4).

Despite these early speech and communication barriers, the claimant subsequently advanced to the 12th grade in regular education classes and graduated from high school with a ranking of 69/249 (Ex. 11E, 3F13).  He also engaged in substantial gainful work activity for several years after graduating (Ex. 6D).  When consultative examiner Paul Tristos, Psy.D., examined him in December 2011, he observed that the claimant stuttered and was unclear in his pronunciation (Ex. 5F1).

R. 19-20.  The ALJ discussed Plaintiff's history of alcohol abuse and experience with

depression and anxiety.  R. 20.  In part, the ALJ referred to Plaintiff's GAF scores of

between 45 and 55.  *Id.*  The ALJ then returns to a discussion of Dr. Tristos'

examination results and stated:

When consultative examiner Paul Tristos, Psy.D., examined the claimant in December 2011, he denied receiving any ongoing mental health treatment (Ex. 5F).  Later in May 2012, the claimant would similarly deny taking any mental health medication (Ex. 10F14).  Dr. Tristos observed that he had difficulty with communication and limited social comfort/ability (Ex. 5F2).  Dr. Tristos opined that these issues were interrupting the claimant's concentration and problem-solving abilities.  Given that Dr. Tristos had an opportunity to personally examine the claimant and render an opinion within his field of expertise, I afford his opinion significant weight.

I afford little weight to the opinions of DDS medical consultants Alan Harris, Ph.D., and Lynda Walls, Ph.D., because I find that the claimant is more limited than they determined and because there is not support in the record for some of their findings, including the finding that the claimant experienced one to two episodes of decompensation of extended duration (Ex. 4A, 8A).

As for the issue of claimant's credibility, I note that his statements are internally inconsistent, a finding which tends to suggest that his allegations of disabling symptoms are less than credible.  In November 2011, the claimant said that he stopped working on October 25, 2010 - his alleged onset date (Ex. 3E2).  However, his earning records clearly show that his work activity continued for more than one year after this date (Ex. 8D).  Furthermore, at the hearing, the claimant testified that he continues to work four to five days each week collecting

cans for recycling.  The claimant has alleged debilitating depression, he failed to take his medication as directed and failed to seek any ongoing treatment for this issue (Ex. 11F2).  Despite his documented history of alcohol abuse, he denied any substance abuse problems (Ex. 3F40).

In sum, the above residual functional capacity assessment is supported by the medical evidence of record and by the opinion of Dr. Tristos.

R. 20-21.

Generally, the claimant meets the criteria for presumptive disability under section 12.05(b) when the claimant presents a valid IQ score of 59 or less, *or under section 12.05(c) when the claimant presents a valid IQ score of 60 through 70 inclusive, and when the claimant presents evidence of an additional mental or physical impairment significantly affecting claimant's ability to work.  See Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir.1992) (a valid IQ score need not be conclusive of mental retardation, where the IQ score is inconsistent with other evidence in the record concerning the claimant's daily activities and behavior).

Crayton v. Callahan, 120 F.3d 1217, 1219-20 (11th Cir. 1997) (emphasis added).  "An ALJ should consider whether the results of an I.Q. test are consistent with the other medical evidence and the claimant's daily activities and behavior."  Henry v. Barnhart, 156 F. App'x 171, 173 (11th Cir. 2005) (unpublished) (citing Popp v. Heckler, 779 F.2d 1497, 1499-1500 (11th Cir. 1986)).  Thus, in order to meet Listing 12.05, Plaintiff had to demonstrate not only that he had a qualifying IQ score, but also that he had "deficits in adaptive functioning initially manifested during the developmental period."  Crayton v. Callahan, 120 F.3d at 1219 ("To be considered for disability benefits under section 12.05, a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22.")  In this case, the evidence did not establish that Plaintiff had either deficits in adaptive functioning or a current and necessarily valid IQ score.

The Commissioner argues as a threshold matter that Plaintiff does not have a valid IQ score, relying on 20 C.F.R., Part 404, Subpart P, Appendix 1, § 112.00D.10. ("IQ test results obtained before age 7 are current for 2 years if the tested IQ is less than 40 and 1 year at 40 or above."). Plaintiff relies on an IQ score, namely a verbal IQ score of 69, from age five, which, by regulation, is only current for one year. *See* Robinson v. Astrue, Case No. 8:11-CV-2741-T-TGW, 2013 U.S. Dist. LEXIS 10494, at*12 (M.D. Fla. Jan. 25, 2013) ("Since the plaintiff's IQ scores when he was eight are not valid with respect to child's benefits, a fortiori, they are not valid for a claim of adult benefits."); *see also* Harrold v. Astrue, 323 F. App'x 114, 116 (3d Cir. 2009) (unpublished) (holding, in part, that child performance IQ score of 69 when six years old too remote for consideration when turning 19 years old at time of hearing).

Further, as noted by the ALJ and not disputed by Plaintiff, Plaintiff advanced to the 12th grade in regular education classes, graduated from high school in  2002 with a ranking of 69/249 and cumulative grade point average of 3.3125 out of 4.0, and he received a standard high school diploma. R. 19; *see* R. 311, 318-20.[5]  Plaintiff continued his education after high school graduation, taking classes at community college, but "kept failing English" so he never completed a degree. R. 40. The ALJ noted that Plaintiff engaged in substantial gainful work activity for several years after graduating. R. 19; *see* R. 21 (ALJ finding that Plaintiff performed past work).

At step three, the ALJ determined that Plaintiff has mild restrictions in activities of daily living and moderate difficulties in social functioning and with regard to

---

[5]  Plaintiff testified that in his later years in high school he had trouble in English and particularly reading comprehension. R. 41. Plaintiff made mostly B's in English in grades nine through 11 and an F and a D in British Literature in grade 12. R. 318-19. Plaintiff testified he eventually passed English "at night school." R. 40.

concentration, persistence, or pace.  R. 17.  The ALJ accounted for Plaintiff's non-exertional limitations when making her RFC assessment by finding that Plaintiff "may perform simple, routine and repetitive tasks; must work in a low-stress environment with only occasional changes in the work setting; may not perform any production rate or pace work; and he may not engage in any complex verbal or written communications."  R. 18.  No error has been shown.

Plaintiff also argues that the ALJ erred because she did not fully develop the record regarding a "possible claim under the 12.05 listing."[6]  Doc. 17 at 7-8.  Plaintiff suggests that the ALJ had pre-judged the issue and erred in not pursuing the matter further after review of Plaintiff's school records.  *Id.*  During the hearing, the ALJ and counsel discussed Listing 12.05 in light of the existing record and the following colloquy transpired relative to this issue.

> ALJ: Okay.  All right.  Now if you could please provide me with a statement of your client's case and where you think he should be found disabled in our process, and which exhibits do you think demonstrate disability in this case?
>
> ATTY: Yes, ma'am.  Your Honor, there's -- Mr. Burton is a younger individual.  He was born May 11, 1984.  It's possible that he has a high-school education, but I'm not really sure that the diploma or that the education that he has is a traditional degree.  I notice that in difference [sic] places they indicated that there may be a learning disability issue.  I know that he told me that that as lifelong, but I didn't see that he had mentioned it to Social Security in any way.  I mean, he mentioned that he had mental issues, but he never particularly said a learning disability until some of the doctors mentioned it.  So it's possible that there's a learning disability out there.  But even aside from that, there's been some alcohol abuse which he hopefully has under control.  Based on some of the later exhibits, it looks like he's pretty close to remission.  But we -- the primary problem that's

---

[6]  Plaintiff bears the burden of proving that he is disabled, and consequently, is responsible for producing evidence in support of his claim.  *See* 20 C.F.R. § 404.1512(a); <u>Moore v. Barnhart</u>, 405 F.3d at 1211.  On the other hand, an ALJ has a clear duty to fully and fairly develop the administrative record.  <u>Brown v. Shalala</u>, 44 F.3d 931, 934 (11th Cir. 1995); 20 C.F.R. § 404.1512(d).  The question is whether there are "the kinds of gaps in the evidence necessary to demonstrate prejudice" to Plaintiff.  <u>Graham v. Apfel</u>, 129 F.3d 1420, 1422 (11th Cir. 1997).

been documented is the depression or, I guess the adjustment disorder.  So I looked at 12.04.  I'm not really sure that he meets the listing there.  *I looked at possibly a 12.05.*  If I could -- if there was an IQ issue I know that some of the GAF scores – it's hard to tell which GAF scores and which GAF scores may be impacted by alcohol, but I know that we have some GAF scores at 1F -- 3F that show, you know, that they're actually below that 50 -- kind of that 50 cutoff.  He seemed to be okay when he saw Dr. Tristows [PHONETIC] which was the consultative position.  And his GAF score there was 50.  So Life Management, their GAF score is right above 50, there at 52.  But if you look at -- and Life Management's been his primary treater.  If you looked at what they said overall, they said within the last 12 months, the highest was 52 or 53 and the lowest had been 45.  So if you kind of averaged that out, I'm assuming he was probably right there at that cutoff, based on their evaluations.  So I would primarily look at Life Management.  And then I note that Dr. Tristows when he examined him, he didn't seem to think that he was under the influence at that time and that seemed to be a pretty accurate exam.  So if his GAF is truly at about 50 when alcohol is not an issue, then he's probably looking at, because of that impact, we're probably looking at, to us, less than sedentary, so maybe 96-8p.

ALJ: *Okay.  Now this -- one thing I just want to mention, regarding -- you know, Dr. Tristows indicated that, you know, that IQ or memory testing could be pursued, not should be pursued in his CE.  And I'll also note, as far as -- I don't know that, even if a low IQ score came back, it would put him in the ballpark for a 1205 listing.*

ATTY: *You mean like --*

ALJ: *I don't know that I would find a 1205 listing, because he has demonstrated adaptive functioning, you know, in working, you know, well above SGA level.  And you know, we'd have to go back to school records, as well.  But I mean, since 2005 through 2010, you know, he was working and earning good money and didn't seem to be having the trouble that he's having now.  So from a --*

ATTY: *Yeah.*

ALJ: *I mean, I don't see this as a 1205 case at all.*

ATTY: *Yes, ma'am.*

ALJ: *But if you differ, now is the time to tell me.*

ATTY: *Well, the only reason that I think it's more relevant now than maybe earlier is that his interaction is a little delayed.  And I think that when you talk to him you'll notice you'll probably notice that.*

ALJ: *Okay.*

ATTY: And I think Dr. Tristows -- you know, they don't usually I mean, they usually say that it's possible that there's sometimes they'll say it's possible that it's borderline intellectual functioning.  But I think he was pretty specific in what he noticed about the claimant that led him to think that there might be learning issues.  *So I don't know if it's something that's more recent that wasn't there prior to age 22 or if it's more of a social anxiety aspect.  So it may not be that it's the 12.05, but I do know he was pretty specific about the client's interaction with him that make him think there might have been a learning issue.*

ALJ: Okay.

ATTY: I don't know, if it's depression or just social situations that he's uncomfortable with, but.

ALJ: Okay.  Okay. Well, if -- you know, *if you want, I'm happy to hold the record open if you want to get the high school records or the school records.  And if you think, for some reason, that supports having, you know, going down the road of 1205 and having the agency pay for additional testing, I mean, I'll entertain your -- you know I'll leave it open if you really think that that's something that you can prove, based on the school records.*

ATTY: *Okay.*

ALJ: I mean, just the fact that someone's ESE and gets a special diploma doesn't mean they meet the listing.

ATTY: Right.

ALJ: You know what I mean?

ATTY: Yes, ma'am.

ALJ: But you know I know that there's speech problems noted in the record and that he told Dr. Tristows that he did have ESE classes in high school.  *But you know, if you want to pursue that, I'll leave it open for you to get those records.*

ATTY: *I'd like to try to get the school records and not that I necessarily will pursue the 12.05.*

ALJ: *Okay.*

ATTY: But they may highlight -- I actually think there's a social interaction issue. It may be a form of autism or something like that. I don't know, some type of --

ALJ: Okay.

ATTY: And that might even elaborate more, even if it's not an IQ issue.  It might elaborate more of the social aspect of what's going on with him.

ALJ: *Okay. What do you need, 30 days?*

ATTY: *That's plenty, Your Honor. I'm sure that we may have even already requested them.*

ALJ: *Or -- okay. Well, you tell me, 21 days or 30 days?*

ATTY: *30 days would be great.*

ALJ: Okay. All right.  Also, I mean, the DNA [PHONETIC] in this case is pretty intertwined.

ATTY: Yes, ma'am.

ALJ: So it's - - you know, it's a tough case from that perspective as well.  And if you think there's something additional when you're talking to the client or that's brought to light today that you think would help demonstrate that DNA is not material in this case.  You know, during the next 30 days, please try to get those records as well.

ATTY: Yes, ma'am.  Okay.  I will.

ALJ: Okay.  All right. Thank you.  All right.  I have some questions for Mr. Burton.

R. 33-38 (emphasis added).

The ALJ and Plaintiff's counsel asked Plaintiff questions throughout the hearing.

R. 38-54.  The following brief colloquy is also relevant with regard to the issues raised

by Plaintiff.

BY THE ADMINISTRATIVE LAW JUDGE:

Q Do you know how to use a computer, sir?

A I do for like surfing the internet or playing games or stuff like that.

ALJ: Okay.  Okay, great.  And Mr. Evans, I -- you know, your questions, I think where you're headed is, you know, trying to deal with competency maybe issues?

ATTY: Yes, ma'am.

ALJ: Is that correct?

ATTY: Yes, ma'am

ALJ: Why don't we -- I mean, let's focus on, you know, the school records will show that.  I mean, he did hold a job, he [c]an do things like that.  I mean, we're not going to prove 1205 today.

ATTY: Okay.

ALJ: Through what's going on in - - because of all the problems we've had with the room itself and being late.  Can you maybe just --

ATTY: Do you want me to just deal with the depression anxiety and that stuff?

ALJ: Let's -- yeah, let's deal with the issues that would disable him.

ATTY: Okay.

ALJ:  That are causing him the trouble.  Thank You.

R. 54-55.  Plaintiff's counsel continued his questioning (regarding anxiety attacks, medication impacts, etc.) of Plaintiff.  R. 55-58.

The record before the ALJ was supplemented with Exhibit 11E (Plaintiff's school records) after the close of the hearing.  Doc. 17 at 8; R. 306-23; R. 26 (Education Records – Medical).  The ALJ referred to Exhibit 11E in her decision.  R. 19.

When the hearing transcript is read in its entirety, the ALJ afforded Plaintiff's counsel the opportunity to develop the record (post-hearing) regarding a possible Listing 12.05 claim.  R. 35-38.  Counsel furnished the ALJ with Plaintiff's school records and nothing more.  R. 306-23.  Plaintiff did not furnish the Appeals Council or this Court with any additional evidence suggesting that the record should be re-opened.

Based on the foregoing, substantial evidence supports the ALJ's step three

determination.  Further, Plaintiff has not demonstrated that the record is inadequate.

**C.  The ALJ did not err in not expressly considering some of Plaintiff's GAF scores that pre-dated his alleged onset date.**

Plaintiff argues the ALJ erred in failing to reference or discuss the GAF scores

less than 45.[7]  Specifically, Plaintiff refers to GAF scores of 34 and 37.  Doc. 17 at 9.

On May 28, 2010, and *prior* to Plaintiff's alleged onset date of October 25, 2010,

Plaintiff was referred by his employer, R. 349-52, and admitted on May 29, 2010, for the

---

[7]  The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the GAF scale that is primarily used by mental health practitioners.  The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR 32-34.  The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale.  *Id.  See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale).  A score of 31-40 is defined as manifesting "[s]ome impairment in realty testing or communication (e.g., speech is at times illogical, obscure, or irrelevant)" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  DSM-IV-TR 34.  A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning.  *Id.*  A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).  In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (5th ed. 2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.  In order to provide a global measure of disability, the WHO Disability Assessment Schedule (WHODAS) is included, for further study, in Section III of DSM-5 (see the chapter "Assessment Measures")."  DSM-5 at 16; *see* Finley v. Colvin, Civil Action No. 3:12-7908, 2013 WL 6384355, at *23 n.9 (S.D. W.Va. Dec. 5, 2013) ("It should be noted that in the latest edition of the [DSM], the GAF scale was abandoned as a measurement tool.").

first time, to a detoxification center (Tri-County Detoxification Unit in Bartow, Florida) for alcohol dependence.  Plaintiff received treatment and was successfully discharged on June 4, 2010.  R. 325-26.  His GAF score was 34 on admission and 37 on discharge. R. 326, 330.  On July 10, 2010, Plaintiff attended a counseling session with a licensed mental health counselor.  R. 348.  He was in better physical condition and seemed less anxious.  He attended several AA meetings, but had resumed alcohol use.  He was encouraged to attend more meetings and given information about alcoholism.  On a positive note, Plaintiff "stated that his boss had commented that his work performance has improved since he has not been drinking."  *Id.*  As of September 9, 2010, Plaintiff had not used alcohol in about three weeks.  R. 343.   He continued to attend AA meetings twice a week and would like to improve his conversation skills, *id.*, which drew a comment from the ALJ.  R. 20.

Plaintiff was admitted at Winter Haven Hospital on October 18, 2010, after he was intoxicated at work.  R. 363.  He was discharged on October 22, 2010.  As noted by the ALJ, Plaintiff "was admitted for inpatient treatment but within two days, his symptoms had improved (Ex. 3F11)."  R. 20.  At discharge, Majd Alsamman, M.D., noted, in part, that Plaintiff's intellectual functioning "[a]ppeared to be average with abstract thinking.  Memory/concentration: Grossly intact.  Judgment/Insight: Limited." Dr. Alsamman assigned Plaintiff a GAF score of 45 and his discharge diagnoses included major depression, recurrent, moderate; alcohol dependence; and problems with social, primary support.  R. 363.  Plaintiff was discharged home with a 30-day supply of his medications and was to follow-up with the Center for Behavioral Health with an appointment scheduled for October 26, 2010, for psychiatric needs, and to

follow-up with Tri County Services for substance abuse issues. *Id.* The ALJ stated that "[l]ess than one week later, [Plaintiff] applied for disability benefits." R. 20. (Plaintiff filed his applications on October 28, 2011, claiming an onset date of October 25, 2010. R. 14.) The ALJ expressly referred to this admission, R. 20 (Exhibit 3F11), and also referred to Plaintiff's range of GAF scores of 45 to 55. R. 20 (Exhibits 8F and 9F).

On December 19, 2011, Plaintiff was examined by a consultant, Dr. Tristos, who assigned Plaintiff a GAF score of 50 and diagnosed Plaintiff with major depressive disorder, moderate, recurrent; history of alcohol abuse; unspecified communication/speech problems; and homeless. R. 427-28; *see* R. 20. Dr. Tristos noted, in part, under "prognosis" that "[t]here also appears to be greater cognitive problem occurring that is disrupting concentration and problems-solving ability. IQ and/or memory testing could be pursued for greater specificity in this regard." R. 428. During the hearing, the ALJ mentioned Dr. Tristos' comment regarding "IQ or memory testing could be pursued, not should be pursued." R. 35.

On February 29, 2012, while being treated at Life Management Center (Center), Plaintiff was assigned a GAF score of 55. R. 444. A psychiatric progress note from the Center dated April 4, 2012, indicated a current GAF score of 52, with the lowest and highest within the last 12 months are 45 and 53, respectively. R. 447; *see* R. 449, 452. Progress notes from August 8, 2012, and September 12, 2012, provide the same GAF scores. R. 477, 480. The ALJ considered Plaintiff's treatment at the Center in 2012. R. 20.

The ALJ considered Plaintiff GAF scores assigned after Plaintiff's alleged onset date, the relevant period of time. It appears that the earlier two GAF scores were

aberrant and not indicative of a reasonable GAF score or at least not consistent with Plaintiff's subsequent scores.  The record shows that Plaintiff's GAF scores stabilized thereafter.  *See, e.g.*, R. 447, 449, 451-52, 475, 477, 480, 483.  Plaintiff has not demonstrated that the ALJ erred when she considered Plaintiff's GAF scores.

## V.  Conclusion

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly applied the law.  Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits is **AFFIRMED**.  The Clerk shall enter judgment for Defendant and **CLOSE** this case.

IN CHAMBERS at Tallahassee, Florida, on February 27, 2014.


**s/ Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**